UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIANA HOWARD-JOHNSON,

        Plaintiff,                                  Case Number 10-13870

v.                                                     Honorable David M. Lawson

V&S DETROIT GALVANIZING, LLC,

        Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Darryl Johnson was fatally injured in an industrial accident while he was working for his employer, defendant V&S Detroit Galvanizing, LLC. His estate has sued the employer, alleging that its conduct has brought it within the so-called "intentional tort exception" to the exclusive remedy provision in Michigan's Worker's Disability Compensation Act. The defendant filed a motion for summary judgment, now pending before the Court, arguing that the facts in the case developed so far do not support the plaintiff's claim, and therefore it is entitled to a judgment as a matter of law. After reviewing the record and the parties' briefs, and hearing oral argument on September 12, 2012, the Court concludes that material fact issues preclude summary judgment. The motion, therefore, will be denied.

I.

V&S Detroit operates a job-shop hot dip galvanizing plant located in Redford, Michigan. It accepts contracts from various customers to galvanize all manner of metal items, ranging from small washers to large structural fixtures used in road construction. Hot dip galvanizing is a process in which a zinc coating is applied to a steel or iron part to protect it from rust and corrosion.

At the Redford plant, metal items to be galvanized are dipped into a vat that contains the coating in liquid form. Multiple parts are dipped at the same time. The parts are hung by wires from a long, steel I-beam called a "rack." The wires thread through holes drilled in the rack, and workers — such as Darryl Johnson — tie the parts to the wires. When the workers perform that task, the rack is set upon tall steel stands. The rack stands look like trestles; each end of the rack is set on a stand while the laborers work under it to attach the parts. Each rack holds between 5,000 and 15,000 pounds of steel parts when loaded. Sometimes, two racks are set on a single pair of stands so that twice as many parts can be hung.

The accident in this case occurred on November 3, 2009. Darryl Johnson was working in the racking department loading metal parts onto one of two racks that were supported by a single pair of stands. Johnson and his coworkers were loading the second of the two racks while another worker — a crane operator — began to lift the first rack and move it away using the large overhead crane. After the first rack was lifted off of the rack stands, the weight of the second rack still resting on the other side of the stands caused the rack stands to lean, and then to tip. As the rack stands started to tip over, the employees began to run. Johnson saw that the rack was falling and tried to get out of the way, but could not escape. The rack with parts attached fell and pinned him to the floor, crushing him. Johnson died soon after from his injuries.

That was not the first time an accident of that sort occurred at the Redford facility. In October or November 2008, Lazar Ostravan was injured while working in the racking department. A rack fell on him as it was being hoisted by a crane. One end of the rack remained on its stand, but the other end fell but was caught by the forks of a hi-lo, which stopped that end from hitting the ground. Ostravan was unconscious for ten minutes after the accident. He suffered a broken leg.

Other plant employees also testified to "near misses" — that is, a rack falling off a stand that did not injure a worker — on another 20 to 40 occasions.

After Darryl Johnson was killed, his personal representative, Tiana Howard-Johnson, filed suit in the Wayne County Circuit Court on August 25, 2010. V&S Detroit removed the case to this Court. After a period of discovery, V&S Detroit filed its motion for summary judgment.

II.

It is well settled that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' . . . ." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Instead, the party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing

party]." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52) (internal quotation marks omitted).

Darryl Johnson's estate received worker's compensation benefits as a result of his work-related death. Under Michigan law, for a worker injured on the job, worker's compensation benefits are the "exclusive remedy" against an employer. Mich. Comp. Laws § 418.131(1). But an exception to that rule has developed over the years.

Michigan's workers' compensation law, first enacted in 1912, altered the conventional tort reparations scheme recognized by the common law by providing a schedule of compensation for workers injured or killed on the job. To recover, the worker did not have to prove fault, and the employer was held immune from tort liability and damages. Initially, the program was voluntary; workers and employers could opt out. *See* Mich. Pub. Act P.A. 10, part I, §§ 5, 8 (1st Ex. Sess. 1912); *Dagenhardt v. Special Mach. & Engineering, Inc.*, 418 Mich. 520, 546-47 & n.26 & 27, 345 N.W.2d 164, 176 & n.26 & 27 (1984) (Levin, J., dissenting). The program was made mandatory in 1943, and the exclusive remedy provision was firmly in place. *Ibid.* The exclusive remedy provision states that compensation allowed under the act "shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease [arising out of and in the course of employment]." Mich. Compiled Laws § 418.131(1).

In 1986, the Michigan Supreme Court carved out an exception to that immunity for intentional torts, when it allowed a worker to sue his employer for intentionally exposing him to "agent orange" without warning him of the toxic properties of the chemical. *Beauchamp v. Dow Chemical Co.*, 427 Mich. 1, 398 N.W.2d 882 (1986). The Michigan legislature reacted quickly to

the *Beauchamp* decision by enacting the version of the statute in effect today. *See Travis v. Dreis and Krump Mfg. Co.*, 453 Mich. 149, 164-65, 551 N.W.2d 132, 139 (1996). The statute now reads:

> The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort. An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge. The issue of whether an act was an intentional tort shall be a question of law for the court.

Mich. Comp. Laws § 418.131(1).

The Michigan Supreme Court has recognized that the intentional tort exception — so called — does not actually require an injured worker to prove a true intentional tort. *Travis*, 453 Mich. at 168, 551 N.W.2d at 141. Certainly, the exception encompasses employer conduct that comprises an actual intent to injure (". . . deliberate act . . . the employer specifically intended an injury."). But a plaintiff also may come within the exception if he can show a somewhat relaxed scienter: that the employer committed a deliberate act with actual knowledge that an injury was "certain to occur." *Gray v. Morley*, 460 Mich. 738, 745, 596 N.W.2d 922, 926 (1999). And the Michigan courts equate action with a failure to act as well. *Travis*, 453 Mich. at 170, 551 N.W.2d at 142 ("[W]e construe the phrase 'deliberate act' to include a situation in which an employer consciously fails to act."). It is this latter aspect of the statute upon which the plaintiff in this case relies.

The cases that interpret the "deemer" clause ("An employer shall be *deemed* to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge.") all require a plaintiff to prove the following proposition: that the employer actually knows that if it orders employees to perform an assigned task in a specific way, an injury *will* occur; and despite that certain knowledge, the employer orders employees to proceed

anyway. Proof of knowledge that an injury *probably* will result is not enough. *Travis*, 453 Mich. at 174, 551 N.W.2d at 143 ("[T]he laws of probability, which set forth the odds that something will occur, play no part in determining the certainty of injury."). The plaintiff must demonstrate inevitability: that "no doubt exists with regard to whether it will occur." *Ibid*. The employer must know both (1) that a dangerous condition exists; and (2) that injury is certain to occur because of that condition. *Id.* at 176, 551 N.W.2d at 144. The occurrence of an injury must be a matter of when, not if.

An illustration of that point is found in comparing the two cases consolidated on appeal in *Travis*. In the first, Aimee Travis was injured when a wire press "double cycled" while she was removing an item from the press. She was a novice press operator and had not been informed that the press was double cycling. The court found that the employer had actual knowledge of the dangerous condition, because an employee had told his supervisor that morning that the machine was double cycling and should be shut down. But the plaintiff failed to show that the employer knew that an injury was certain to occur because the machine only double cycled intermittently, and the same supervisor had adjusted it that morning in an attempt to cure the double cycling problem. In the past, such adjustments had allowed the machine to function for a day or two without double cycling again. The court noted that the supervisor, after adjusting the machine, had operated it himself before assigning the plaintiff to work on it. The court also observed that the "plaintiff was not required to confront a continually operating dangerous condition." *Id.* at 182, 551 N.W.2d at 146. The court concluded that Travis did not offer facts showing that her injury was certain to occur.

Compare the companion case in *Travis*. There, plaintiff Stanislaw Golec was at work loading scrap metal into a furnace using a tractor. He told his supervisor that the scrap contained aerosol cans, that the scrap was wet, and that when putting one load into the furnace earlier, a small explosion had occurred, which caused the plaintiff a minor injury. The supervisor knew that the scrap contained aerosol cans and water, and that those items could cause explosions when the scrap was loaded into the furnace. Despite that knowledge, the supervisor ordered the plaintiff to continue working and to load all of the scrap, which the plaintiff understood to include the aerosol cans. At some point, as the plaintiff was placing a load in the furnace, a large explosion occurred that injured him severely. The plaintiff testified that he had loaded the scrap in the way he was trained, but that the explosion occurred anyway. The court found that the employer knew an injury was certain to occur, despite the fact that not every load produced an explosion, because each load of scrap could have contained either an aerosol can or water, and thus had the potential to explode. *Id.* at 186-87, 551 N.W.2d at 148-49.

The employer's knowledge of the certainty of injury must be actual. "[C]onstructive, implied, or imputed knowledge is not enough. Nor is it sufficient to allege that the employer should have known, or had reason to believe, that injury was certain to occur." *Travis*, 453 Mich. at 173, 551 N.W.2d at 143. "A plaintiff may establish a corporate employer's actual knowledge by showing that a supervisory or managerial employee had actual knowledge that an injury would follow from what the employer deliberately did or did not do." *Id.* at 173–74, 551 N.W.2d at 143. "[T]o impute an intent to injure to the employer, a plaintiff is required to show that a particular employee of the defendant possessed knowledge of facts from which it could be concluded that this employee had the requisite intent to injure." *Palazzola v. Karmazin Prods. Corp.*, 223 Mich. App. 141, 152, 565

N.W.2d 868, 874 (1997). Although prior instances of injury are relevant to the questions of knowledge and certainty, alone they do not suffice to show that an injury was certain. *Travis*, 453 Mich. at 174, 551 N.W.2d at 143. ("[J]ust because something has happened before on occasion does not mean that it is certain to occur again. Likewise, just because something has never happened before is not proof that it is not certain to occur.").

In this case, the crux of the plaintiff's liability theory is that V&S Detroit exposed its employees who hung parts from the racks to a continuously operative dangerous condition that it knew would inevitably result in an injury. The plaintiff contends that placing two racks on a pair of stands created such an instability that tip-overs were common and injuries were certain to follow. The Michigan Supreme Court held in *Travis* that the plaintiff could make a showing of actual knowledge and certainty where (1) the employer subjects an employee to a continuously operative dangerous condition (2) that the employer knows will cause an injury, and (3) the employer refrains from informing the employee about the dangerous condition so that he is unable to take steps to keep from being injured. 453 Mich. at 178, 551 N.W.2d at 145. However, "[a] continuously operative dangerous condition may form the basis of a claim under the intentional tort exception only if the employer knows the condition will cause an injury and refrains from informing the employee about it." *Giles v. Ameritech*, 468 Mich. 897, 897, 660 N.W.2d 72, 72 (2003). The Michigan Court of Appeals explained that this standard does not require a showing of failure to inform if the employee already knows of the hazard; but in such a case the plaintiff would have to show that the employer (1) knew that employees were taking insufficient precautions to protect themselves against the inherent danger of the condition; and (2) did nothing to remedy the situation. *Johnson v. Detroit Edison Co.*, 288 Mich. App. 688, 704, 795 N.W.2d 161, 172 (2010).

As an example of a continuously operative dangerous condition, the *Travis* court cited a case in which (1) workers at a film reprocessing plant were exposed to hydrogen cyanide gas fumes that arose from chemical vats; (2) the employer knew of the dangers of the gas due to plain warnings on the containers for the chemicals; and (3) the employer hired only workers who could not speak or read English, and did not inform them of the dangers of the gas, despite their repeated complaints about the fumes. The corporate officers involved were convicted of manslaughter for their conduct, which resulted in one death and several serious injuries. *Travis*, 453 Mich. at 177, 551 N.W.2d at 145.

The evidence in this case would permit a reasonable jury to conclude that V&S Detroit knew the racks and stands were dangerous, most likely all the time. Workers complained about the racks and near misses and asked management to bolt the racks to the floor. Dennis Landers — who worked for V&S Detroit off and on between 1993 and 2010, including later tenure as a supervisor — and Corey Lawson — who worked as a plant supervisor and operations manager — both testified that as supervisors they knew the racks were unstable and had asked for the racks to be bolted down. Lawson said that when he started at V&S Detroit, the rack stands had only one rack holder each. At some point the stands were changed to hold two racks, in order to increase productivity. After the change to double rack holders, it was clear that the racks became dangerous, because they could topple over. Darryl Maxey, a sixteen-year veteran of the Redford plant, testified that before the rack stands were bolted down, the stands could tip and fall over if one rack was removed while another loaded rack remained on the stand. And there is testimony that shows that (1) Gary Snyder, the maintenance supervisor for V&S Detroit's parent company, knew about the hazzard and had made plans to bolt the racks down in order to address those problems prior to Johnson's death; and (2)

plant manager Thomas Bottorff himself only narrowly escaped injury when a rack tipped over while he was standing near it.

Whether there is evidence that the defendant knew that an injury was certain to occur presents a closer question. The Sixth Circuit has discussed the requisite level of proof under Michigan Complied Laws § 418.131(1). In *Upsher v. Grosse Pointe Public School System*, 285 F.3d 448 (6th Cir. 2002), the court held that the plaintiffs, custodians who were exposed to asbestos in the workplace, failed to make the required showing under the continuously operative dangerous condition standard. The employer wanted carpet removed from an area in a school, but a contractor hired for the job refused to proceed because of concerns that a machine scraper might disturb asbestos tiles under the carpet. So the school ordered custodial staff to complete the removal by pulling up the carpet. When they pulled the carpet up, the plaintiffs found some tiles stuck to the back and decided to hammer, scrape, and pulverize the tiles to remove them. The employer did not provide any respirators, particulate vacuums, or air monitoring for the removal operation. Some of the plaintiffs had received two hours of asbestos awareness training, but none had completed the fourteen hours of training that federal regulations require prior to conducting any work which involves disturbing asbestos containing materials. The court found that the failure to provide proper training and safety equipment may have been grossly negligent, but it did not suffice to show that supervisors knew about the dangers and refrained from informing the workers about them, or that the employer had willfully disregarded actual knowledge of a condition certain to cause injury. *Id.* at 455-56.

In *House v. Johnson Controls, Inc.*, 248 F. App'x 645 (6th Cir. 2007), the court held that the plaintiff could not show actual knowledge of an injury certain to occur. The plaintiff was working

on a die-flipping operation with coworkers, where large 5,000 to 25,000 pound steel dies were lifted via an I-beam attached to a forklift, pushed by another vehicle in order to flip them over, then lowered to the ground. The die in this case did not flip over, and the plaintiff left a designated safe distance zone to see if it was hung up on something. For unknown reasons, the die broke loose from the I-beam, causing the beam to swing around and hit the plaintiff in the leg. The court held that the employer could not have known that an injury was certain to occur because it did nothing to inhibit the employee from taking precautions that would have saved him (i.e. remaining in the designated safe area), and the employer could not know whether an employee would choose to leave the safe area to investigate a problem with the process. The court was not impressed by a supervisor's affidavit that stated that he was sure someone would get hurt at some point during the process because it was dangerous, the workers lacked special equipment designed for die flipping, and there were no standard procedures for workers to follow. A critical deficiency, in the court's view, was the absence of any proof of the actual cause of the accident. *Id.* at 648-49.

The Sixth Circuit in *House* surveyed a number of decisions applying Michigan Compiled Laws § 418.131(1) and *Travis*, finding that "House's evidence of employer knowledge, it bears adding, is far less compelling than the evidence presented in several claims summarily rejected by the Michigan courts." *Id.* at 649. In *Alexander v. Demmer Corp.*, 468 Mich. 896, 660 N.W.2d 67 (2001), the plaintiff was injured while cleaning pinch rollers when there had been four prior injuries from the rollers. *See Alexander v. Demmer Corp.*, No. 230417, 2002 WL 1921900, at *2 (Mich. Ct. App. Aug. 20, 2002) (per curiam). The Michigan Supreme Court summarily reversed the court of appeals and granted summary judgment for the employer. Similarly, in *Joliff v. Detroit City Dairy, Inc.*, 468 Mich. 919, 664 N.W.2d 211 (2003), the court summarily reversed and granted summary

judgment where the employer had twice ordered the employee — over his protest — to drive a pallet jack that had no brakes. *See Joliff v. Detroit City Dairy, Inc.*, No. 232530, 2002 WL 31012627, at *1-2 (Mich. Ct. App. Sept. 6, 2002). In *Giles v. Ameritech*, 468 Mich. 897, 660 N.W.2d 72 (2003), the court summarily reversed and granted summary judgment where the employee was instructed to use a torch to splice telephone wires in a hole with a natural gas line. In *Menzel v. Light Metals Corp.*, 464 Mich. 853, 627 N.W.2d 601 (2001), the court summarily reversed and granted summary judgment where the employer knew that a press was double cycling and that a safety device had failed.

A central theme of these cases is that when an employer gives a worker discretion in deciding how to accomplish a task, and the employee chooses a dangerous option, the employer cannot be "certain" that an injury will follow. As the Sixth Circuit explained, "[t]o be 'known' and 'certain,' an injury must spring directly from the employee's duties and the employee cannot have had the chance to exercise individual volition. In cases where the employee makes a decision to act or not act in the presence of a known risk, the injury is not certain because the employer cannot know what the employee's reaction will be in advance and the employee is able 'to take steps to keep from being injured.' " *House*, 248 F. App'x at 648.

Here, the defendant points to evidence that workers were instructed to clear the area when a rack was to be hoisted by a crane operator. After Ostravan's accident, V&S Detroit sent crane operators to additional training and held safety meetings at which the need to clear areas before crane lifts was discussed. Despite the testimony that safety did not come first at V&S Detroit, and her assertion that V&S Detroit "implicitly authorized" workers to ignore safety policies in order to boost production, the plaintiff has offered no evidence that any supervisor actually told workers

-12-

directly to ignore the stated policies. And it appears that several employees did take care to clear areas or to make sure areas were cleared before a lift occurred, and that as a result they did not have an accident with the racks.

But just because the lift operations were performed safely on some occasions does not defeat the proposition that an injury was inevitable. A central point in each of the cases where Michigan courts have found an intentional tort is that, when the employee did exactly as he or she was told, the dangerous condition he or she faced still caused an unavoidable injury. In *Golec*, for example, if the employee's testimony was believed, even though he loaded the scrap exactly as directed, each load had the potential to cause a dangerous explosion, and nothing he could have done would have allowed him to avoid injury from the explosion. Likewise in *Fries v. Mavrick Metal Stamping, Inc.*, 285 Mich. App. 706, 777 N.W.2d 205 (2009), the press operator had no idea that her loose clothing would cause the press to cycle, and when that occurred, there was no way for her to remove her hands in time to avoid an injury. And in *Johnson v. Detroit Edison Co.*, 288 Mich. App. 688, 795 N.W.2d 161 (2010), if the employees did exactly as they were told, nothing they could have done would have avoided injuries from ash blowback due to the defective boilers, because the employees lacked the safety equipment that might have protected them.

In this case, there is no evidence presented that the plaintiff attended any of the safety meetings or otherwise was informed of the plant's policy to clear an area when a rack was to be lifted. But even if such evidence exists, there are facts from which a jury could conclude that the custom in the plant was for parts hangers to continue wiring parts to the second rack on a double stand when the loaded first rack was being lifted. Corey White, a five-year employee, testified that there were policies and procedures in the racking department regarding safety, but prior to Johnson's

-13-

death, the policy that workers had to clear the area before the crane lifted a rack was never enforced. Before Johnson's death, managers watched crane operators lift racks over the workers heads often without saying anything; workers had lifted loads off the rack stands and over Bottorff's head many times, and Bottorff did nothing about it. If a policy did exist requiring workers to clear the area during lifts, it was not enforced. Landers testified that at the time of Ostravan's accident, it was "kind of a practice to just keep working," and "nobody like scattered when the other guy was lifting a rack." Def.'s Mot. Summ. J., Ex. D, Landers dep. at 53. He said it was common practice in the racking department for workers to keep tying up parts on one rack while another rack was lifted and moved overhead.

Landers also explained that moving a rack took several minutes, and it would have slowed down the work in the racking department if workers moved away from the racks every time one was lifted. The plant manager and operations manager "pretty much said" that the safety practice was for workers to move away, but the work also had to get done. *Id.* at 78. Landers testified that the plant manager and operations manager told everybody, "We need to keep production numbers up." *Id.* at 79. Maxey also testified that supervisors and managers often told workers to "hang more weight" on the racks to increase production. Pl.'s Reps. to Mot. Summ. J., Ex. 7, Maxey dep. at 26–27. Workers in racking sometimes got into heated arguments with supervisors over the danger of overloading the racks, but management always responded by saying, "Just do what we tell you to do." *Id.* at 27.

The danger appears to have originated when V&S Detroit changed to the practice of loading two racks perched on a single pair of stands. The purpose of that practice was to increase productivity — a purpose that would be defeated by clearing the area of parts hangers when a loaded

rack was lifted. A jury could conclude that Johnson was injured while he was performing his work task exactly as his employer told him.

A jury could find the inevitability of the injury from the evidence of the occurrences of other falling racks, which appears to have been common. Corey Lawson saw racks lean, tilt, and topple over when a loaded rack was lifted off of the stands, due to the uneven weight from the partly loaded rack that the stands were still supporting. Lawson testified that on some of the times that he saw racks or stands topple over, people got hurt. Lawson knew that racks could slide out of the holders on the rack stands, either because the racks shifted due to uneven weight, or because a rack stand got twisted out of alignment and no longer supported the rack on one side. Lawson testified that he saw "many, many . . . near misses," where racks fell off the stands or stands toppled over. Def.'s Mot. Summ. J., Ex. F, Lawson dep. at 39.

Lawson also testified that four to six people regularly worked under the racks at a time while another worker operated the crane. When one group would finish loading the rack, "99 percent of the time" the operator would pick up the loaded rack, and all the weight would shift to the side of the stand left holding another rack, which could make the stands topple over. *Id.* at 16. In one part of the plant the company removed a wall that stood behind the racks because the wall had been knocked out so many times by toppling racks.

Landers testified that he saw rack stands tip over onto their sides two times during the time he worked at V&S Detroit. Nobody was injured in either of those two accidents because nobody was working around the racks at the time. Carl Neal recalled four or five occasions when the racks and rack stands fell over, although no one was hurt. Darryl Maxey recalled eight to ten times over the course of sixteen years that he worked at V&S Detroit when he heard of near misses in the

racking department, where a rack or stand fell but no one was injured. He said that workers, supervisors, and plant managers all knew about these sorts of accidents. Derrick Riley saw racks and rack stands fall or tip over at least five times in the four years that he worked at V&S Detroit. A rack and stand tipped over and fell on Corey White within the first six months he worked at V&S Detroit, but he was not injured. And, as noted above, Derrick Riley testified that once he was working while Bottorff was in the racking area, and a rack fell, almost hitting Bottorff. All of those incidents preceded Lazar Ostravan's injury from a falling rack. The jury could infer from that evidence that the occurrence of a serious injury from a rack falling on a worker hanging parts during a crane lift was a matter of when, not if.

As noted earlier, the evidence also demonstrates that management at V&S Detroit's Redford plant was aware of the dangerous condition and the certainty that an injury would occur, and proceeded in willful disregard of that knowledge.

The Court finds, therefore, that the record presents material factual issues on the issue of liability. The Court is not able to conclude as a matter of law that the plaintiff cannot establish the exception to the worker's compensation exclusive remedy bar found in Michigan Complied Laws § 418.131(1).

### III.

The Court concludes that genuine issues of material fact prevent summary judgment in the defendant's favor.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #28] is **DENIED**.

It is further **ORDERED** that the case management and scheduling order is modified as follows:

The proposed joint final pretrial order is due **on or before October 16, 2012**.

The Final Pretrial Conference shall take place on **October 23, 2012, at 9:00 a.m.**

Trial shall commence on **November 6, 2012, at 8:30 a.m.**

The balance of the Case Management and Scheduling Order remains in effect.

>           s/David M. Lawson
>           DAVID M. LAWSON
>           United States District Judge

Dated:   September 21, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 21, 2012.

>           s/Deborah R. Tofil
>           DEBORAH R. TOFIL